**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

v.                            No. CR 07-701 LH

JESUS MANUEL DIAZ,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

On February 4, 2008, Defendant Jesus Manuel Diaz filed a Motion to Suppress Evidence (Doc. 71). The Court held a hearing on this motion on April 23, 2008. Following the hearing, Defendant filed a supplemental brief (Doc. 83). The Court, having considered all the parties' briefs, the arguments of counsel, the relevant case law, and the evidence presented at the hearing, finds that the motion is not well-taken and will deny the motion.

**I.    FACTUAL FINDINGS**

On March 19, 2007, around 9:40 a.m., Defendant drove his commercial tractor-trailer through the Gallup Port of Entry ("POE"). Defendant approached the customer service counter to purchase a New Mexico weight and distance permit. The two inspectors were busy, so New Mexico Motor Transportation Officer James Smid, a sworn police officer with the New Mexico Department of Public Safety, assisted Defendant. Officer Smid has extensive knowledge and experience regarding New Mexico's regulatory scheme for commercial truck drivers and has conducted approximately 2,500 inspections.

Defendant had all the documents needed for the permit, so Officer Smid began preparing him a manual receipt. Officer Smid asked him how much his load weighed. Defendant handed him

a copy of the bill of lading, a contract between the shipper, Dollar More Corp., and the carrier/driver, USA Truck/JDS EasyLine.  The bill of lading listed a load weight of 9,762 pounds and indicated that an advance of $1,600.00 was to be deducted.  Officer Smid asked Defendant how much his weight was, and Defendant produced a weigh scale ticket showing a gross weight of 56,760 pounds.  Based on his training and experience, Officer Smid found the weight discrepancy suspicious, because he knew that an empty tractor-trailer weighs about 32,000-33,000 pounds with fuel.  Adding 9,762 pounds would give a gross weight of approximately 42,000 pounds, meaning that there were approximately 14,000 pounds that were unaccounted for.  It appeared that Defendant was carrying more load than what was listed in the bill of lading, and he had no other bills of lading.  Officer Smid also found it strange that Defendant scaled out because he did not need to weigh in given the low load weight.  During this part of the encounter, Defendant answered Officer Smid's questions promptly and looked him in the eye.

Because of the weight discrepancy, Officer Smid decided to do a Level Two Inspection. When Officer Smid told Defendant he was going to perform a Level Two inspection, Defendant looked down and said, "okay."  Generally, when conducting a Level Two inspection, Officer Smid reviews the driver's documents to ensure they are valid and properly maintained, walks around the outside of the tractor and trailer to visually determine that all equipment is in good working order, and inspects the cab and interior of the trailer to ensure the cargo is properly secured.

At around 9:45 a.m., Officer Smid began the document portion of the Level Two inspection at the counter.  Officer Smid asked Defendant for his log book.  Officer Smid noticed a lot of down time for the first 19 days of March.  Officer Smid asked him why he had spent so much down time in California.  Defendant hesitated, looked down, and said he had the flu.  Officer Smid asked him how long he had been in California.  Defendant responded that he had been there for two months.

2

Officer Smid asked him if he had been sick that entire time.  Defendant stuttered, looked down, and said, "yes."  Officer Smid found this answer suspicious because the flu usually lasts a few days to a week and truck drivers generally do not make money if they are not driving.  Officer Smid then inquired as to why he had scaled out when he should have known he would not be over his gross weight.  Defendant stuttered, looked down, and answered that sometimes shippers put more on the load than what is indicated on the bill of lading.  Officer Smid found this answer suspicious too because he knew that legitimate shippers only ship what is ordered.  Additionally, at one point, Defendant stated that he had gone to Mexico to visit his family, which was inconsistent with his story that he had been sick with the flu.  Officer Smid noticed that Defendant's overall demeanor changed from the permit stage to the initial stage of the inspection.  Defendant now was lowering his head, rubbing his lips with his hand, scratching his neck, and appearing more nervous.

Officer Smid had Defendant pull his tractor-trailer into an inspection bay.  During his outer inspection, Officer Smid noticed a lock and seal on the trailer doors, which was unusual due to the nature and weight of the load.  When Officer Smid inspected the cab, he noticed the cab was very clean, unlike most trucks, because drivers spend so much time in their cabs.  He also observed three cell phones but no CB radio.  He asked Defendant why he did not have a CB radio.  Defendant responded that he sold it because he needed money.  Officer Smid then observed a fourth cell phone.  Officer Smid found the four cell phones suspicious because drug runners often carry multiple cell phones.  In Officer Smid's experience, when drivers had three or more cell phones, which occurred in about 30 of his investigations, all were found to be carrying drugs.  The lack of a CB radio was also odd because the vast majority of truck drivers have a CB radio, because it is a means of free communication.  Officer Smid estimated that, in his experience, only about 10-11 out of 2,500 trucks he inspected did not have a CB radio.  Officer Smid found it suspicious that Defendant sold

the CB radio because he needed money, yet he had enough money to pay for four cell phones.

Officer Smid then checked the load in the trailer.  Defendant told him that the shipper had sealed the load.  Officer Smid noticed that the seal had a serial number that matched the bill of lading, but it was a commercially available seal as opposed to a seal unique to the shipper, a fact Officer Smid found strange because Defendant said the shipper sealed the load.  Although Defendant expressed concern about his liability if the officers searched the contents of the trailer, he removed the lock after Officer Smid explained that New Mexico regulations allow inspection of the trailer no matter who owns it.  When Officer Smid broke the seal and opened the trailer, he smelled a strong odor of air freshener, which he knew to be commonly used by drug traffickers to mask the odor of drugs.  Nothing on the bill of lading indicated that Defendant was shipping air fresheners.

The 53-foot trailer was full of packages to the very rear and nearly from the floor to the ceiling.  Rods clamped the load together.  The boxes were packed tightly together, and wedged in the middle (from left to right), between the boxes, were cellophane-wrapped packages.  As Officer Smid approached the cellophane-wrapped packages, the air freshener smell got stronger.  He looked back at Defendant, who would not make eye contact with him.  Officer Smid climbed a ladder to try to see into the trailer.  He noticed a large amount of dust on the boxes further inside the trailer while the boxes towards the rear did not have dust.  This observation added to his suspicions because, based on his training, it appeared to be a cover load, a load that stays in the trailer to look like a legitimate load.

At the end of the inspection, at 10:17 a.m., Officer Smid issued Defendant an inspection report that listed three violations:  an inoperable light bulb and two log-book violations involving missing shipping information.  Defendant signed the report.  At this time, based on all his

4

observations, Officer Smid believed he had reasonable suspicion and probable cause to believe Defendant was transporting narcotics, so he asked Defendant if he could ask him a few more questions. Defendant said, "okay." Officer Smid inquired if he had any cocaine, heroin, or methamphetamine. Defendant promptly replied "no" to all three. When Officer Smid asked him if he had any marijuana, however, he hesitated, turned toward the trailer, laughed nervously, and said, "no." Defendant's nervousness gave Officer Smid further reason to suspect criminal activity, so he asked Sergeant Armstrong, his supervisor at the POE, to call for a canine officer. About this time, Sergeant Armstrong asked Officer Dave Halona to assist in keeping an eye on Defendant. Sergeant Armstrong then left for magistrate court.

Officer Smid then asked Defendant for permission to search the tractor and trailer. Officer Halona arrived around this point. At the time he asked, Defendant's driver's license may have been on a desk.[1] Officer Smid presented Defendant with a written "Consent to Search" form in both English and Spanish. Although Defendant spoke fluent English, Officer Smid asked him if he read better in English or Spanish. When he responded that he read better in Spanish, Officer Smid read to him the Spanish portion of the form. Defendant then read the form to himself and signed it. The Spanish portion of the consent form gave consent to Officer Smid to search the tractor and trailer, including luggage, containers, and its contents. The consent form explicitly informed Defendant of his right to refuse consent to search and his right to refuse to sign the form. Defendant signed and dated the form around 10:30 a.m.

---

[1]Officer Smid and Officer Halona testified that they could not recall where Defendant's driver's license and other documents were at the time he consented to the search. Officer Halona, however, agreed that it was "possible" that Defendant's license was on a desk at the time. Based on the evidence presented at the hearing, the Court is unable to definitively determine where Defendant's documents were at the time he gave consent to search.

At approximately 10:45 a.m., Officer Smid patted Defendant down, which he nearly always does for safety reasons before conducting a search when he suspects criminal activity. Officer Smid then got some gloves and began to search the cab. When Officer Smid began to search the cab, Defendant told him he had $1,500 cash in the cab, which a broker gave to him as an advance. Officer Smid had never before seen this practice, which added to his suspicions. While Officer Smid searched the cab, Defendant was present, calm, and talkative.

Officer Smid began his search of the trailer at 10:55 a.m., at which point Defendant become quieter and less talkative. Officer Smid again noticed the strong odor of air freshener. Officer Halona, who was standing several feet from the back of the trailer with Defendant, also smelled a strong, distinctive odor of air freshener. Officer Smid opened one of the shrink-wrapped packages. The package contained fabric seat cushions in terrible condition, further indicating they were a cover load. Officer Smid again noticed the strong smell of air freshener that seemed to emanate from the seat cushions.[2]

Around 11:15 a.m., Sergeant Armstrong contacted Officer Lucero to ask him to respond to the scene with Brenda, his drug-detecting canine. Officer Lucero said that he had been on the night shift and was not on duty at the time, so it would take him about 45 minutes to an hour to get Brenda, change, and drive to the POE. Sergeant Armstrong replied that he was not sure if he could

---

[2]Officer Smid did not see any air freshener devices, and Defendant urges the Court to characterize the smell as that of a "petroleum-based product," consistent with the odor associated with the merchandise itself. Officer Smid, however, repeatedly described the smell as "air freshener" and associated the odor with odors that narcotics traffickers often use as masking agents. Officer Halona likewise described the odor as "air freshener." When defense counsel pressed Officer Smid on this issue, Officer Smid continued to describe the odor as "air freshener." Officer Smid also testified that he was aware that some air freshener comes in cans that can be sprayed onto fabric. The Court thus finds that the odor the officers detected was air freshener, consistent with an odor used to mask the smell of drugs.

hold Defendant for that long, but Officer Lucero assured him that there was federal case law that allowed for that length of a detention so long as he made an effort to get to the scene.

Meanwhile, Officer Smid continued to struggle to remove boxes, but because there were so many packages that were bundled so tightly together, he felt he needed help to unload the trailer, and Officer Halona was occupied watching Defendant. At 11:55 a.m., Officer Smid called Officer Lucero to determine where he was. Officer Lucero said he was at the 55-mile post, approximately 39 miles away, and would be there in about 25 minutes. While waiting for Officer Lucero to arrive, Officer Smid searched diligently, without taking any breaks. He continued moving boxes and looking for other compartments and an easier way into the trailer. On the top of the trailer, near the front right side, there was an 8 by 12-inch piece of plexiglass riveted to the trailer. Officer Smid found this compartment unusual and he looked for a way to get into the trailer through the plexiglass. In Officer Smid's experience, he had only seen a compartment like this when it was involved in illegal narcotics or contraband.

While the search was ongoing, Defendant told Officer Halona that he had just started his trucking company. He also explained that he had one cell phone for the job and three separate phones for each of his girlfriends. Defendant stated that he would need a letter from the motor transportation department regarding the inspection. Defendant expressed concern that somebody better reload the boxes because he had an injured shoulder. Additionally, a couple times during the search, he told Officer Halona that he was running out of hours to drive his truck and asked when the search would be done. Defendant expressed concern that people were starting to call him and he was not able to answer his phone. Officer Halona helped calculate how many hours Defendant would have left to drive that day and noted that he would not have much driving time left. Officer Halona told him that, once the officers ran the drug dog around the truck and assuming everything

7

was okay, he could leave.

At approximately 12:15 p.m., Officer Lucero arrived. He walked Brenda, who is very accurate in detecting narcotics, around the exterior of the truck. When Brenda encounters an odor of narcotics, she signals an "alert" by changing her posture and increasing her breathing. Brenda gives an "indication" of narcotics by scratching, biting, or barking. Brenda "alerted" to the exterior left nose of the trailer twice. The first time, she sat down, which is a great indicator, and increased her respiration. She did not sit down when alerting for the second time. When Officer Lucero took Brenda inside the rear of the trailer, she did not alert or indicate. At this point, Officer Smid considered letting Defendant go, given Brenda's failure to alert to the inside of the trailer and how difficult it would be to conduct a search. Officer Lucero, however, recommended that they both conduct a hand search.

As they took out the packages in the middle of the trailer, a pathway emerged. It took the officers approximately 30 minutes to unload the boxes. They discovered that the pathway was really a tunnel built out of lumber that looked like a wooden crate. The tunnel ran down the middle of the trailer toward the front of the truck for about 40 feet. Officer Smid crawled into the tunnel and felt a black plastic bag. He cut the bag open and smelled marijuana.

Officer Smid arrested Defendant around 12:45 p.m. The officers unloaded the rest of the trailer. They discovered approximately 3,000 pounds of marijuana.[3]

## II.   DISCUSSION

---

[3]Officer Lucero explained that Brenda may not have alerted to the marijuana when inside the trailer because the odor was too overwhelming. In her training, the largest amount of marijuana she had been exposed to was 2,000 pounds. Officer Lucero stated that she recognized the smell and alerted when outside the trailer, where the odor was more muted, but did not recognize the odor in the large quantity when inside the trailer.

### A.      Standing

To challenge an unlawful search and seizure, a defendant must demonstrate his own constitutional rights have been violated.  *United States v. Higgins*, 282 F.3d 1261, 1270 (10th Cir. 2002).  The defendant must show a subjective expectation of privacy in the area searched and that his expectation is one that society is prepared to recognize as objectively reasonable.  *United States v. Kopp*, 45 F.3d 1450, 1452 (10th Cir. 1995).  Important factors to consider include ownership, lawful possession, or lawful control of the place searched.  *United States v. Abreu*, 935 F.2d 1130, 1133 (10th Cir. 1991).  Courts consider a defendant's privacy interests in a trailer separately from his interests in the truck to which the trailer is attached.  *See Kopp*, 45 F.3d at 1452 (citing *Abreu*, 935 F.2d 1130).  Although a defendant's ownership of the truck and physical linkage between the truck and trailer are factors to consider, they alone do not convey standing.  *See id.* at 1452-53.

In this case, the trailer was physically linked to the tractor, Defendant had the keys to the trailer, and he was the only individual who controlled access to the trailer.[4]  Defendant thus has standing to challenge the search of the trailer.  Moreover, Defendant, as the driver of the truck, "unquestionably has standing to contest the stop of the truck and the continued detention of the truck and of his person."  *Id.* at 1453.

### B.      Regulatory Inspection

Although Defendant conceded  in his motion the legality of his initial detention to obtain a New Mexico weight permit and his referral to a Level Two Inspection under the regulatory search exception to the Fourth Amendment's warrant requirement, *see* Def.'s Mot. to Suppress Evidence

---

[4]This latter fact distinguishes the case from *Kopp*, the case relied upon by the Government.  In *Kopp*, the passenger, not the defendant, rented and controlled the key to the trailer.  *See Kopp*, 45 F.3d at 1452-53.

(Doc. 71) at 9, in a footnote in his supplemental brief, Defendant appears to contest the legality of the permit process and Level Two Inspection, *see* Def.'s Supplemental P. & A. in Supp. of the Mot. to Suppress Evidence (Doc. 83) at 8 n.3.  Defendant argues that the permit process and Level Two Inspection are constitutionally suspect for five reasons: (1) with the passage of the International Fuel Tax Agreement ("IFTA"), it is not certain that Defendant was required to purchase a New Mexico travel permit; (2) it is not clear that New Mexico authorizes anyone but the head of the POE to conduct a Level Two Inspection; (3) Officer Smid testified that his decision to subject a truck to a Level Two Inspection is random and that there are no guidelines that he follows to determine when to conduct the inspection; (4) Officer Smid stated that he made no effort, other than to look for a sticker on a windshield, to determine whether Defendant, having been recently inspected, was immune from a Level Two Inspection; and (5) Officer Smid had Officer Halona watch Defendant during the inspection.

Inspection of a closely regulated industry is an exception to the warrant requirement.  *See United States v. Vasquez-Castillo*, 258 F.3d 1207, 1210 (10th Cir. 2001).  A warrantless inspection of a closely-regulated industry is constitutional if (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the inspection is necessary to further the regulatory scheme; and (3) the regulatory scheme, in terms of the certainty and regularity of its application, provides a constitutionally adequate notice that the commercial property owner will be subject to periodic inspections for specific purposes, notifies owners as to whom is authorized to conduct an inspection, and limits the discretion of inspectors in time, place, and scope.  *See id.* at 1210-11 (citing *New York v. Burger*, 482 U.S. 691, 701-03 (1987)).

The Tenth Circuit has concluded that New Mexico's regulatory scheme satisfies each factor of the *Burger* test.  *See id.*  With respect to the third factor, the court observed the following:

10

> We find that the regulatory scheme governing commercial carriers provides adequate
> notice to owners and operators of commercial carriers that their property will be
> subject to periodic inspections and adequately limits the discretion of inspectors in
> place and scope.  New Mexico law requires all commercial motor vehicle carriers to
> "stop at every port of entry . . . for manifesting and clearances stickers."  N.M. Stat.
> Ann. § 65-5-1(A).  The operators of commercial motor vehicle carriers are required,
> upon request, to produce a manifest containing fourteen specific items of information
> relating to the vehicle and its owner, driver, and cargo.  N.M. Stat. Ann. § 65-5-1(B).
> Inspectors at the port of entry are permitted to verify this information and to
> ascertain whether the condition of the vehicle is safe for operation on the state's
> highways.  N.M. Stat. Ann. § 65-5-1(C).  To determine whether the vehicle is safe,
> those in charge of the port of entry are permitted to "inspect the vehicle *and its
> contents* to determine whether all laws and all rules and regulations of the
> departments of [New Mexico] with respect to public safety, health, welfare, and
> comfort have been fully complied with."  N.M. Stat. Ann. § 65-5-1(F) (emphasis
> added).  New Mexico has also authorized its employees to enforce federal laws
> relating to commercial motor vehicle carriers.  N.M. Stat. Ann. § 65-1-9.

*Id.* (alterations in original).

The analysis in *Vasquez-Castillo* and its progeny governs the resolution of this case.  In

*United States v. Gwathney*, 465 F.3d 1133 (10th Cir. 2006), the Tenth Circuit not only reaffirmed

the constitutionality of the New Mexico regulatory scheme under the *Burger* test, but also held that

the officer "was justified in entering the trailer to inspect the cargo pursuant to his regulatory duty

to inspect the contents of the trailer."  *Id.* at 1140 (citing N.M. Stat. Ann. § 65-5-1(F)).  In so

holding, the Tenth Circuit explained:  "The *Burger* criteria apply to a regulatory scheme generally,

not to the particular search at issue. . . . In other words, the *Burger* criteria are applied generally to

a statutory scheme, not to a given set of facts arising under that scheme."  *Id.* (quoting *United States

v. Maldonado*, 356 F.3d 130, 136 (1st Cir. 2004)).  Consequently, Defendants' efforts to distinguish

this case factually fail as a matter of law.  *Cf. United States v. Mitchell*, 518 F.3d 740, 751-52 (10th

Cir. 2008) (refusing to consider whether facts of case distinguished it from *Vasquez-Castillo* because

under established circuit precedent New Mexico statutory scheme for commercial trucking industry

met requirements of warrant exception for closely regulated industry).[5]  Given this circuit's repeated

holdings that the New Mexico statutory scheme meets the requirements of the warrant exception and

allows officers assigned to POE to conduct Level Two Inspections and to enter trailers to inspect

cargo, Officer Smid permissibly conducted the Level Two Inspection and entered the trailer to

---

[5]The Court notes that Defendant's arguments as to why this case is distinguishable are unconvincing for several additional reasons.  As to his first argument, Officer Smid testified that an IFTA license is strictly for fuel, so even if Defendant had an IFTA license, he needed a New Mexico permit.  Moreover, Defendant stopped and asked for the permit on his own; Officer Smid did not require him to stop for one or tell him he needed one.  Furthermore, NMSA § 65-5-1 requires that all commercial trucks stop at every POE.  N.M. Stat. Ann. § 65-5-1(A). New Mexico's interest in requiring trucks to stop at the POE is more than simply to ensure truckers pay for a permit.  New Mexico also has an interest, for example, in ensuring that trucks are in a safe condition.  *See* N.M. Stat. Ann. § 65-5-1(C).  Defendant was thus required to stop at the POE, even if he had an IFTA license.

With regard to Defendant's second argument, the Tenth Circuit does not appear to view the New Mexico statutory scheme as requiring that inspections be conducted only by the head of the POE.  *See Gwathney*, 465 F.3d at 1136 n.1 (quoting *Vasquez-Castillo*, 258 F.3d at 1209) ("[New Mexico] authorizes *personnel assigned to the ports of entry* to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with state laws regarding public safety, health, and welfare.") (emphasis added).  In fact, the *Gwathney* court upheld a regulatory inspection conducted by Officer Smid, the same sworn police officer involved in this case.  *See id.* at 1136-40.

Third, although Officer Smid testified that he does not have guidelines as to when to conduct a Level Two Inspection and that he does so depending on factors such as the time, his availability, and any discrepancies in the driver's documents, NMSA § 65-5-1 provides notice to drivers that, after the commercial motor vehicle has stopped at the POE, the vehicle may be inspected.  *See* N.M. Stat. Ann. § 65-5-1(C)-(F).  The Tenth Circuit has found that this constitutes constitutionally adequate notice.  *See Vasquez-Castillo*, 258 F.3d at 1210-11.

Fourth, Officer Smid testified that he could conduct a Level Two Inspection, even if Defendant had just had one done in Arizona.  Although a Level One Inspection is good for three months, an inspector is trained to put a sticker in the lower right-hand corner of the cab's window showing that the inspection had been conducted.  Officer Smid looked for the sticker, but did not see one, so there was nothing to indicate that Officer Smid should not perform the Level Two Inspection.

Finally, given that Officer Smid had reason to suspect Defendant of possible criminal activity, the fact that Officer Smid asked Officer Halona to "watch" Defendant while he conducted the regulatory or investigative search does not violate the Fourth Amendment.  There is no evidence that Officer Halona restrained Defendant in any way during the search.  For purposes of officer safety, it is reasonable to have an officer watch a potential suspect while the inspecting officer's attention is directed elsewhere.

inspect the cargo without a warrant.  *See Gwathney*, 465 F.3d at 1140.

### C.    Investigative Detention and Search

Defendant additionally argues that his continued detention was not based on reasonable suspicion, that he did not give voluntary consent to the search, and that the length of the detention and search was not justified.

### 1.    Investigative detention supported by reasonable suspicion

An investigative detention is an exception to the probable cause requirement.  *See Terry v. Ohio*, 392 U.S. 1, 26 (1968).  To determine whether an investigative detention is reasonable, the court must determine whether (1) the officer's action was justified at its inception, and (2) it was reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).  An investigative detention is justified at its inception only if the officer is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity.  *See Terry*, 392 U.S. at 20-21.

During the course of the Level Two Inspection, Officer Smid's suspicions grew based on the following observations: (1) inconsistent weights suggesting Defendant was carrying more load than what was listed on the bill of lading; (2) log book entries showing considerable down time; (3) Defendant's inconsistent story about going to Mexico to visit his family after he had said he had been sick with the flu; (4) Defendant's change in demeanor, in which he showed increased nervousness from the initial permit process through the inspection; (5) Defendant's explanation for why he scaled out being inconsistent with the use of legitimate shippers; (6) four cell phones; (7) lack of a CB radio, which was highly unusual because most truck drivers use them to take advantage of a means of free communication; (8) Defendant's explanation that he sold the CB radio because

he needed money, even though he had four cell phones; (9) the use of a lock and seal on the trailer doors, which was unusual due to the nature and weight of the load; (10) the commercially available seal was not unique to shipper, even though Defendant said the shipper sealed the trailer; (10) the large amount of dust on boxes further into the trailer, consistent with a cover load; and (11) the strong odor of air freshener, consistent with an attempt to mask the odor of drugs.  The totality of the circumstances gave Officer Smid reasonable suspicion to continue to detain Defendant in order to ask him additional questions and to continue his investigation.  *See United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (implausible travel plans, significant nervousness, and use of rental car gave rise to reasonable suspicion of drug trafficking); *Kopp*, 45 F.3d at 1453-54 (continued detention justified where defendant's explanation of travel plans was not plausible and answers were at odds with passenger's own inconsistent responses).  Furthermore, Defendant's hesitation and nervous laughter when asked if he had marijuana in the truck added a twelfth factor indicating criminal activity.

### 2.     Consent to search was freely and voluntarily given

Consent to search is an exception to the Fourth Amendment's warrant requirement.  *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992).  "Valid consent is that which is "freely and voluntarily given.'"  *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).  The court must determine whether the consent was unequivocal, specific, and freely and intelligently given, and whether it was given without implied or express duress or coercion.  *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997).  "The central question is whether 'a reasonable person would believe he was free to leave or disregard the officer's request.'"  *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *United States v. Manjarrez*, 348 F.3d 881, 885-86 (10th Cir. 2003)).  The government bears

the burden to show that the consent was voluntary. *United States v. Patten*, 183 F.3d 1190, 1194

(10th Cir. 1999). Mere acquiescence to a claim of lawful authority is insufficient to meet the

government's burden. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968).

Whether a person consented is a factual determination based on the totality of the

circumstances -- both the characteristics of the accused and the details of the interrogation. *See*

*Schneckloth*, 412 U.S. at 226; *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006).

Courts look to a number of non-exclusive factors: the suspect's knowledge of the right to refuse

consent; the suspect's age, intelligence, education; the nature of the questioning and request; the

threatening presence of a number of officers; the demeanor of the officers, such as their tone of

voice indicating that compliance with the request was compulsory; the prolonged retention of the

suspect's personal effects such as identification; the absence of other members of the public; the

length of the interview; whether the officers displayed a weapon; whether the officer advised the

suspect that he was free to leave; whether the consent request occurs during the suspect's detention;

and whether the person granting consent exhibits discomfort during the search or expresses a desire

to halt the search. *See Schneckloth*, 412 U.S. at 226; *Cruz-Mendez*, 467 F.3d at 1265; *Ledesma*, 447

F.3d at 1314; *United States v. Winningham*, 140 F.3d 1328, 1332 (10th Cir. 1998).

Defendant argues that the following factors compel the conclusion that he did not freely and

voluntarily consent to the search of the truck: (1) he had already been detained more than a half

hour; (2) there were two or three armed peace officers around him at the time; (3) the area was not

open to the public and was outside the presence of other truck drivers; (4) he had already been

repeatedly subjected to questioning; and (5) Officer Smid was in possession of his driver's license

and other documents. As noted above, the evidence presented at the hearing is inconclusive as to

whether or not Officer Smid had possession of Defendant's license and other documents at the time

Defendant agreed to the search.  Nevertheless, even if the Court were to find that Officer Smid had possession of these documents, the totality of the circumstances establishes that Defendant's consent was voluntary.

Although the retention of a defendant's documents is a significant factor to consider in determining consent to search, *see United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1309 n.7 (10th Cir. 2006); *United States v. Lee*, 73 F.3d 1034, 1040 (10th Cir. 1996), "detention is only one factor to be considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances." *Contreras*, 506 F.3d at 1037.  "A person may voluntarily consent to a search even while being legally detained." *Id.  See also United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.").

In this case, the weight of the evidence demonstrates that Defendant's consent was voluntarily given.  Defendant was expressly informed of his right to refuse consent to search. Officer Smid read to him the Consent to Search form in Spanish, and then Defendant read the form to himself.  The Spanish consent form, like its English counterpart, informed Defendant of his right to refuse consent and declared that no promises, threats, force, or coercion had been used against him to get him to consent to the search or to sign the form.  Defendant signed the form.  This factor weighs heavily in favor of finding Defendant's consent to be voluntary.  Furthermore, Officer Smid was casual and polite throughout the inspection and investigation, and the nature of his questioning was not threatening or coercive.  Neither Officer Smid nor Officer Halona displayed a weapon at any point during the encounter, nor did they employ any other show of force.  Additionally, the search occurred during the day.  Based on all these facts, Defendant's consent was freely and voluntary given and not the result of implicit or overt coercion.  *Cf. Contreras*, 506 F.3d at 1037

(holding that, even if driver was still under lawful detention at time, her consent to search was voluntary based on officer's casual phrasing of request, his tone of voice, his lack of show of force, stop was in daylight on highway, and driver repeatedly responded "okay" when officer reiterated his requests for consent); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (concluding that consent was voluntary, even though defendant was detained at time because officer retained his license, because defendant was not under duress or coercion and seemed relaxed); *United States v. Botero-Ospina*, 73 F.3d 374, *2 (10th Cir. Dec. 27, 1995) (unpublished opinion) (same); *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995) (concluding that defendant's consent was voluntary, even though officer had not returned license and registration to her, because officer did not apply overt coercion or display weapon and search was during day near public highway).

Furthermore, when giving his consent to search, Defendant did not restrict the search in any way. *Cf. United States v. Rosborough*, 366 F.3d 1145, 1150-51 (10th Cir. 2004) (determining that statement to "go ahead" did not restrict search by either time or location). Nor did Defendant later withdraw his consent to search. Ambiguous statements are generally not sufficient to withdraw consent. *See United States v. Gregoire*, 425 F.3d 872, 881 (10th Cir. 2005) (affirming district court's finding that consent was not withdrawn or limited by defendant's ambiguous statements). Although Defendant told Officer Halona that he was running out of hours to drive his truck and asked when the search would be done, Defendant did not unambiguously limit the scope of the search or ask any of the officers to stop searching the tractor-trailer. His expressions of impatience simply did not objectively communicate a desire to revoke his consent. *See id.*; *United States v. Brown*, 345 F.3d 574, 580-81 (8th Cir. 2003) (mere expressions of impatience or complaints about duration of search do not effectively revoke consent).

### 3.    Search was supported by probable cause

Probable cause to search a vehicle under the automobile exception to the Fourth Amendment's warrant requirement is established if, under the totality of the circumstances, there is a fair probability that the vehicle contains contraband or evidence. *Vasquez-Castillo*, 258 F.3d at 1212. "Probable cause is a matter of probability, not certainty." *United States v. Stephenson*, 452 F.3d 1173, 1178 (10th Cir. 2006).

The Court concludes that the totality of the facts here indicate a substantial chance of criminal activity, rising to the level of probable cause, at the end of the regulatory search. The twelve facts that support reasonable suspicion also contribute to the probable cause analysis, particularly the multiple cell phones, the layer of dust on the interior boxes, and the strong smell of air freshener that suggested to Officer Smid a conscious attempt to mask the odor of drugs. *See United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997) (air freshener in car was factor in probable cause analysis). Officer Smid testified that, in his experience, of the approximately 30 instances in which a truck driver had three or more cell phones, all of them were found to be transporting narcotics. The following additional facts, discovered shortly after Officer Smid's consensual search began, further indicated that there was a fair probability that the trailer contained hidden drugs: (13) Defendant told Officer Smid he had $1,500 cash in a bag in the tractor; and (14) the packages in the trailer contained seat cushions in terrible condition, indicating they were part of a cover load.[6] Based on the totality of the circumstances, Officer Smid had probable cause to search the tractor and trailer at the end of the regulatory inspection, or at the latest, when Officer Smid opened the packages of seat cushions during the consensual search. *See Gwathney*, 465 F.3d at

---

[6]Officer Smid's discovery of the plexiglass compartment is a fifteenth factor contributing to his probable cause analysis, although it appears he did not discover it until sometime between the time he opened the packages and the time Officer Lucero arrived. *See Ledesma*, 447 F.3d at 1317-19 (signs of hidden compartment contributed to conclusion that there was probable cause).

1137-40 (holding that officer had probable cause to inspect non-conforming packages in commercial truck's trailer because it was unusual to load perishable potatoes prior to having truck repaired, driver paid $14,000 in cash for repairs, non-conforming packages were hidden behind boxes of potatoes, and footprints and smashed boxes indicated that nonconforming packages had been placed there after potatoes were loaded); *United States v. Faison*, 195 F.3d 890, 894 (7th Cir. 1999) (holding that officer had probable cause to search truck because defendant's paperwork was not in order, which was unusual for truck drivers; he was in violation of several regulations; he was unable to provide specific destination; he seemed agitated; officer smelled substance commonly used as masking agent for drugs; and boxes contradicted defendant's statement that he had no cargo).[7]

### 4.   Length of search was reasonable

An investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). There is no absolute rule for determining how long an investigative detention may continue; rather, the length of the stop and the potential intrusion on Fourth Amendment rights must be juxtaposed against the law enforcement purposes to be served by the stop and the time reasonably needed to effectuate those purposes. *Rosborough*, 366 F.3d at 1150 (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). A court should examine whether the police diligently pursued their investigation in a manner that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *Sharpe*, 470 U.S. at 686. It is the government's burden to show that a seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention. *See Royer*, 460 U.S. at 500.

---

[7]These cases demonstrate, contrary to Defendant's argument, that evidence of a hidden compartment is not a prerequisite to finding probable cause.

In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court held that a 90-minute detention of a suspect's luggage based on reasonable suspicion and in the absence of probable cause was unreasonable under the Fourth Amendment. *Id.* at 709-10. In *Place*, officers in Miami believed that an airline passenger's luggage contained narcotics, based on the passenger's behavior in line, discrepancies in the addresses on the luggage tags, and the fact that neither address existed. *See id.* at 698. The Miami officers notified agents in New York who detained the luggage upon the passenger's arrival, and subjected the bags to a "sniff test" when a narcotics dog arrived 90 minutes later, at which time the dog alerted to one of the bags. *See id.* at 698-99. The Supreme Court, after noting that the New York agents had ample time to arrange for a drug dog to meet the passenger upon his arrival, concluded that the 90-minute detention was unreasonable. *See id.* at 709-10. The Court, however, declined to adopt an outside time limitation for an investigative detention. *Id.* The Court stated that "in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Id.* at 709.

Defendant, relying on *Place*, contends that the length of his detention was unreasonable. The detention and search in this case lasted approximately two to two-and-one-half hours.[8] The instant case is nonetheless distinguishable from *Place* because here Officer Smid had probable cause to search the trailer after the regulatory inspection, or at the latest, when he opened the packages of deteriorated seat cushions during the consensual search; in any event, well before the drug dog even

---

[8]The time Defendant was legitimately detained for the regulatory inspection is not factored into the calculus for determining the length of the investigative detention. *See United States v. Brown*, 24 F.3d 1223, 1225 (10th Cir. 1994) (noting that any "unreasonable detention" began after parolee continued to be detained following permissible detention for his production of urine specimen); *United States v. Bejarano-Ramirez*, No. Cr. 00-1066 LH, slip op. at 8-9 (Doc. 37) (D.N.M. Dec. 7, 2000) (finding that detention began after officer issued citation). The Level Two Inspection ended at 10:17 a.m., Brenda alerted around 12:15 p.m., and the drugs were discovered about 12:45 p.m.

arrived. *See Rosborough*, 366 F.3d at 1153 n.3 (noting that two-hour total detention was permissible because hour-plus search subsequent to canine alert was supported by probable cause); *Anderson*, 114 F.3d at 1065-66 (upholding search of vehicle with hidden compartment that trooper conducted at patrol headquarters, even though trooper had probable cause to search at roadside); *United States v. Jodoin*, 672 F.2d 232, 234-35 (1st Cir. 1982) (indicating that, because there was probable cause to search suitcase, its overnight detention was constitutional).[9]

Moreover, Officer Smid acted diligently in conducting the search.  At the end of the Level Two Inspection, when he believed that the trailer contained contraband, he immediately asked Sergeant Armstrong to call for a canine officer.  While waiting for Officer Lucero, he searched the tractor and trailer without taking any breaks.  The load's size and the way in which it was tightly packed made it difficult for Officer Smid to complete the search of the trailer and remove its contents.  He nevertheless continued moving boxes and looking for other compartments and ways to get into the trailer.  Officer Lucero likewise acted diligently in his efforts to get to the scene.  Once he spoke to Sergeant Armstrong, he immediately went home to get Brenda and change.  His remote location added to the delay, but he drove quickly to the POE.  When he arrived, he assisted Officer Smid to help speed up the search.  Accordingly, because the officers had probable cause to search the truck and they conducted the search with diligence, the two to two-and-one-half hour search was reasonable and did not violate the Fourth Amendment.[10]

---

[9]Indeed, Defendant does not argue that the length of the search was unreasonable even if Officer Smid had probable cause to search after the regulatory inspection.

[10]It would be unreasonable for the Court to place an arbitrary restriction on the time it should take for an officer to conduct a search, because as demonstrated here, it would unduly reward those criminals who go to greater efforts to construct obstacles to hide their contraband.

III.    **CONCLUSION**

Based on the totality of the circumstances, Officer Smid had probable cause to search the tractor-trailer following the permissibly conducted regulatory inspection.  The duration of the search was reasonable because it was based on probable cause and the officers conducted the search diligently.  Defendant's Fourth Amendment rights were therefore not violated.


**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 71) is **DENIED**.


_____

SENIOR UNITED STATES DISTRICT JUDGE